1
2
3
4
5
6
7

**FILED**
CLERK, U.S. DISTRICT COURT

5/9/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

8                    UNITED STATES DISTRICT COURT

9                FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                      October 2023 Grand Jury

11  UNITED STATES OF AMERICA,          CR No. 2:24-cr-00295-RGK

12          Plaintiff,                 I N D I C T M E N T

13          v.                         [26 U.S.C. § 7212(a): Endeavoring
                                       to Obstruct the Administration of
14  ANDREW A. WIEDERHORN,              the Internal Revenue Code; 26
    WILLIAM J. AMON,                   U.S.C. § 7201: Evasion of Payment
15  REBECCA D. HERSHINGER, and         and Assessment of Tax; 26 U.S.C.
    FAT BRANDS INC.,                   § 7206(2): Aiding and Assisting
16                                     Filing of False Tax Returns; 18
            Defendants.                U.S.C. § 1343: Wire Fraud; 15
17                                     U.S.C. §§ 78m(k), 78ff: Extension
                                       and Maintenance of Credit in the
18                                     Form of Personal Loan from Issuer
                                       to Executive Officer; 15 U.S.C.
19                                     §§ 78m(b)(2)(B), 78ff(a) and 17
                                       C.F.R. § 240.13b2-2: False
20                                     Statements and Omission of
                                       Material Facts in Statements to
21                                     Accountants in Connection with
                                       Audits and Reviews; 18 U.S.C.
22                                     § 1350(c)(2), 17 C.F.R.
                                       §§ 229.402, 229.404: Certifying
23                                     Faulty Financial Reports; 18
                                       U.S.C. § 1001(a)(2): Making False
24                                     Statements; 18 U.S.C. § 2(b):
                                       Willfully Causing Act To Be Done]
25
26
27       The Grand Jury charges:
28

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

A.   SUMMARY OF INDICTMENT

1.   Defendant ANDREW A. WIEDERHORN was the Chief Executive Officer and controlling shareholder of defendant FAT BRANDS INC. ("FAT"), a publicly traded casual-dining franchise company.  From no later than in or around 2010 through in or around January 2021, defendant WIEDERHORN caused defendant FAT, as well as its affiliate, Fog Cutter Capital Group Inc. ("FOG"), to compensate him through approximately $47 million in distributions, which he, defendants WILLIAM J. AMON and REBECCA D. HERSHINGER, and others categorized as "shareholder loans" from FOG in order to conceal the true nature of the payments from defendant FAT's Board of Directors ("Board"), its independent auditors, its minority shareholders, the Securities and Exchange Commission ("SEC"), and the broader investing public.

2.   In fact, as defendant WIEDERHORN then knew, these distributions were not loans, and defendant WIEDERHORN had no intention of repaying these sham "loans."  For years, he posted no collateral, was not even assessed interest, and made no payments on interest or principal.  Instead, defendant WIEDERHORN caused the $47 million in compensation and distributions to be both extended and periodically forgiven from in or around 2016 through in or around January 2021.  In other words, defendant WIEDERHORN, posing as both "lender" and "borrower," caused defendant FAT and FOG to extend to him and then "forgive" tens of millions of dollars in distributions made in the fraudulent form of loans -- all while paying no income tax on these distributions and, in fact, using them to generate net

operating losses ("NOLs") to provide defendant FAT with financially beneficial tax treatment.

3.    In so doing, defendant WIEDERHORN willfully concealed from the Internal Revenue Service ("IRS") millions of dollars of taxable income, thereby evading payment of millions of dollars in preexisting tax debts and evading assessment of millions more.

4.    As defendant WIEDERHORN's tax preparer, defendant AMON willfully assisted and advised defendant WIEDERHORN to submit fraudulent filings to the IRS omitting millions of dollars in taxable income, notwithstanding defendant AMON's awareness that defendant WIEDERHORN was fraudulently treating as "shareholder loans" cash transfers that defendant WIEDERHORN had otherwise repeatedly referred to as "distributions" and "compensation."

5.    To sustain the scheme, and despite federal laws designed to protect investors and insure transparency and integrity by prohibiting publicly traded companies from extending or maintaining credit to their executives in the form of shareholder loans, defendants WIEDERHORN and HERSHINGER misrepresented and concealed the true nature of the payments from defendant FAT's Board, its independent auditors, its minority shareholders, the Securities and Exchange Commission ("SEC"), and the broader investing public, and, along with other employees of defendant FAT, caused defendant FAT illegally to extend and maintain credit to defendant WIEDERHORN in the form of shareholder loans.

6.    On or around December 1, 2021, defendants WIEDERHORN and FAT learned that defendant WIEDERHORN was the target of a federal criminal investigation into defendant WIEDERHORN's and defendant FAT's financial dealings.  On or around February 22, 2022, defendant

1    FAT publicly claimed that it was "cooperating with the government

2    regarding these matters."  After members of defendant FAT's Board

3    communicated with the government regarding that federal criminal

4    investigation, however, defendant WIEDERHORN removed every director

5    other than himself on or around March 28, 2023, and reconstituted

6    defendant FAT's Board with a majority of non-independent directors

7    under his control.

8    B.    DEFENDANTS AND RELATED PERSONS AND ENTITIES

9         7.    Defendant WIEDERHORN was a resident of Beverly Hills,

10    California.

11         8.    Defendant WIEDERHORN was the Chief Executive Officer

12    ("CEO") and controlling shareholder of defendant FAT, a Delaware

13    corporation headquartered in Beverly Hills.  As the CEO of defendant

14    FAT, defendant WIEDERHORN owed fiduciary duties, including duties of

15    care and loyalty, to defendant FAT, and was also required to certify

16    that defendant FAT's periodic reports with the SEC, including annual

17    reports using SEC Form 10-K and quarterly reports using SEC Form 10-

18    Q, fully complied with requirements of the Securities Exchange Act of

19    1934 and that information contained in those reports fairly

20    presented, in all material respects, the financial condition and

21    results of operations of defendant FAT.

22         9.    Defendant FAT was a global franchising company that

23    acquired and developed casual-dining restaurant concepts, including

24    Fatburger, Johnny Rockets, Hurricane Grill and Wings, Yalla

25    Mediterranean, and Ponderosa and Bonanza Steakhouses.  Defendant FAT

26    was also an "issuer" of securities as defined by Title 15 of the

27    United States Code, subject to the reporting requirements set forth

28

1   therein, and its shares were listed and traded on the Nasdaq National
2   Market ("Nasdaq") under the ticker symbol "FAT."

3       10. Defendant WIEDERHORN was also the controlling shareholder
4   of FOG. FOG was a holding company headquartered in Beverly Hills
5   that ultimately conveyed its ownership interests in restaurant brands
6   to defendant FAT in connection with defendant FAT's 2017 Initial
7   Public Offering ("IPO") and the December 2020 merger between
8   defendant FAT and FOG.

9       11. FOG owned approximately 80% of defendant FAT's outstanding
10  shares after defendant FAT's 2017 IPO, and defendant WIEDERHORN and
11  his family members and associates owned and controlled approximately
12  80% of FOG.

13      12. Defendant AMON, a resident of Los Angeles, California, was
14  a Managing Director of the Los Angeles Office of Andersen, a global
15  tax-advisory firm. Defendant AMON was a Certified Public Accountant
16  ("CPA") licensed in California, an inactive attorney, and an
17  experienced tax professional with approximately forty-five years of
18  advisory experience. Defendant AMON, with other colleagues at
19  Andersen, provided tax-advisory services to defendants WIEDERHORN and
20  FAT as well as to FOG.

21      13. Defendant HERSHINGER was a resident of Los Angeles County
22  and defendant FAT's Chief Financial Officer ("CFO"). As defendant
23  FAT's CFO, defendant HERSHINGER owed fiduciary duties, including
24  duties of care and loyalty, to defendant FAT, and was also required
25  to certify that defendant FAT's periodic reports with the SEC,
26  including annual reports using SEC Form 10-K and quarterly reports
27  using SEC Form 10-Q, fully complied with requirements of the
28  Securities Exchange Act of 1934 and that information contained in

1  those reports fairly presented, in all material respects, the

2  financial condition and results of operations of defendant FAT.

3  C.    FEDERAL TAX OBLIGATIONS

4      14.    The Internal Revenue Code ("Title 26") imposed four types

5  of tax obligations on employers with respect to wages paid to

6  employees: (1) income tax; (2) Social Security tax; (3) Medicare tax;

7  and (4) federal unemployment tax (collectively, "payroll taxes").

8      15.    Income tax was calculated based upon the amount of wages

9  employees received; Social Security tax and Medicare tax were imposed

10  by the Federal Insurance Contributions Act ("FICA") and were

11  collectively referred to as "FICA" taxes.  FICA taxes were imposed

12  separately on employees and on employers.

13      16.    Employers were required to withhold employee FICA taxes and

14  income taxes from the wages paid to their employees, and to pay over

15  the withheld amounts to the United States.  The employer's duty to

16  pay over income taxes required to be collected existed even if the

17  taxes were not actually withheld from the employees' wages.  The

18  employee FICA taxes and income taxes that employers were required to

19  withhold and pay over to the United States were commonly collectively

20  referred to as "Trust Fund Taxes" because federal law required

21  employers to hold the withheld amounts in trust until they were paid

22  to the United States Treasury on employees' behalf.

23      17.    The IRS assessed a Trust Fund Recovery Penalty ("TFRP")

24  against any person responsible for collecting or paying withheld

25  Trust Fund Taxes who willfully failed to collect or pay them.  A

26  responsible person was a person or group of people at an employer

27  with the duty to perform and the power to direct the collecting,

28  accounting, and paying of Trust Fund Taxes.

18.  Gross income was defined under Title 26 as all income from whatever source derived, including, but not limited to, the following items: (1) compensation for services, including fees, commissions, fringe benefits, and similar items; (2) gross income derived from business; (3) gains derived from dealings in property; and (4) dividends.  Bonuses from employers were included in the definition of gross income.

19.  Individuals who failed to pay over taxes due were subject to civil IRS collection efforts.  The IRS had the power to levy and seize assets to satisfy delinquent tax balances.

20.  NOLs arose under the federal tax laws when a company's allowable deductions exceeded its taxable income.  NOLs could be applied to offset a company's tax liability in other, subsequent periods through a "loss carryforward."

D.  METHODS OF COLLECTING AND EVADING TAXES OWED

21.  If an individual did not pay the full amount of taxes owed, the IRS could institute a collection process to satisfy the outstanding tax obligation.  Some individuals who owed tax could qualify for a payment plan, known as an installment agreement, under which the taxpayer made payments in monthly installments.  The IRS relied upon taxpayers' stated income and assets in fashioning repayment plans and other efforts to collect taxes owed.

22.  To assess a taxpayer's ability to repay a tax debt, the IRS also required completion of an IRS Form 433-A ("Form 433-A"), otherwise known as a "Collection Information Statement for Wage Earners and Self-Employed Individuals," which required detailed, current financial information from taxpayers.

23.  Concealing income and assets by omitting or misstating items on a Form 433-A, avoiding transfers of funds into taxpayer accounts, and titling assets under nominee individuals and business entities were known methods to impede and evade IRS collection efforts.

24.  Generating compensation in forms that appeared not to be income, such as in the form of reimbursements, shareholder loans, and transfers of funds through intermediary entities, were additional methods used to generate income while evading IRS efforts to assess taxes owed upon such income and collect preexisting tax debts.

E.  DEFENDANT WIEDERHORN'S PRIOR SHAREHOLDER BORROWING AND LENDING, FELONY CONVICTIONS, AND KNOWLEDGE OF RELEVANT TAX LAWS

25.  Beginning no later than in or around 1993, defendant WIEDERHORN began to cause Wilshire Credit Corporation ("WCC"), a company for which he served as CEO, to make distributions in the form of shareholder loans to himself and to a colleague ("WCC Executive"). Defendant WIEDERHORN made these distributions to himself and WCC Executive in a 2:1 ratio, which corresponded to their employment and compensation agreement.

26.  As the size of defendant WIEDERHORN's distributions in the form of shareholder loans increased between 1993 and 1998, defendant WIEDERHORN's tax advisors, including Tax Advisor 1, advised defendant WIEDERHORN that he was required to repay these debts or else pay income tax on their forgiveness.  Tax Advisor 1 also advised defendant WIEDERHORN that he was required to make interest and principal payments on shareholder loans, and that, to the extent defendant WIEDERHORN's borrowings had rendered him insolvent, any additional borrowings in the form of shareholder loans would be

legally improper because it would be commercially unreasonable for a lender to extend additional loans in that circumstance (i.e., loaning substantial amounts of money to someone with no ability to repay the loans).

27.  Notwithstanding these warnings from Tax Advisor 1, defendant WIEDERHORN continued the extensions of credit from WCC to himself and WCC Executive, including extensions and distributions beyond amounts previously authorized by defendant WIEDERHORN himself and despite WCC Executive's protests and objections.

28.  In or around 1998, a publicly traded affiliate of WCC controlled by defendant WIEDERHORN, Wilshire Financial Services Group ("WFSG"), plummeted in value in connection with a collapse in the value of WCC's loan portfolio.  Defendant WIEDERHORN nevertheless continued to compensate himself and WCC Executive through distributions made in the form of shareholder loans from WCC notwithstanding the collapse of the value of defendant WIEDERHORN's holdings in WCC and WFSG.

29.  Defendant WIEDERHORN ultimately forgave $65 million in outstanding putative shareholder loan debts he had owed to WCC.

30.  Beginning no later than in or around 2001, defendant WIEDERHORN was informed that he was a target of a federal grand jury investigation into his business and financial dealings, and was informed no later than in or around 2003 that that investigation included his pattern and practice of causing companies under his control to extend and forgive shareholder loans to him.

31.  On or about June 3, 2004, defendant WIEDERHORN resolved that investigation by pleading guilty to Payment of Gratuities, in violation of Title 18, United States Code, Section 1954, and Filing a

False Tax Return, in violation of Title 26, United States Code, Section 7206(1), in the United States District Court for the District of Oregon, case number 3:04-cr-00238-BR.

32. FOG and its affiliates were related corporate entities and successors to WFSG and WCC, and, beginning no later than tax year 2008, FOG and its affiliates generated payroll-tax liabilities for which defendant WIEDERHORN became responsible in the form of TFRPs.

F. <u>DUTIES OF ISSUERS, CEOs, AND CFOs UNDER THE FEDERAL SECURITIES LAWS</u>

33. Under the federal securities laws, defendant FAT, as an issuer of securities, was required to file comprehensive periodic reports with the SEC, including annual reports using SEC Form 10-K and quarterly reports using SEC Form 10-Q.

34. SEC regulations required defendant FAT to disclose certain information regarding related party transactions and executive compensation in their SEC Forms 10-K.

      a. <u>Related Party Transactions – 17 C.F.R. § 229.404</u>

          i. Defendant FAT was required to disclose, in the "Relationships and Related Transactions" portion of its SEC Form 10-K, all disclosures prescribed by Item 404 of SEC Regulation S-K, including "any transaction, since the beginning of the registrant's last fiscal year . . . in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

          ii. A "related person" included "[a]ny director or executive officer" of the company as well as "[a]ny immediate family member of a director or executive officer of the registrant."

iii. Item 404 defined a transaction as "any financial transaction, arrangement, or relationship (including any indebtedness or guarantee of indebtedness)."  The disclosure was required to include the name of the related person, the person's relationship to the public company, the nature of the person's interest in the transaction, and the amount of the person's interest in the transaction.

      b.   <u>Executive Compensation - 17 C.F.R. § 229.402</u>

i. Defendant FAT was also required to disclose, in the "Executive Compensation" section of its SEC Form 10-K, "all plan and non-plan compensation awarded to, earned by, or paid to" the CEO and all directors "by any person for all services rendered in all capacities to the registrant" for the last completed fiscal year. The term "plan compensation" included "[a]ny plan, contract, authorization or arrangement, whether or not set forth in any formal document, pursuant to which cash, securities, . . . or any other property may be received.  "A plan may be applicable to one person."

      c.   <u>CEO and CFO Certification – 15 U.S.C. § 7241</u>

i. Among other requirements imposed by federal securities laws, CEOs and CFOs of companies required to file periodic reports with the SEC were required to sign and certify that:

        (I)  They had reviewed such report;

        (II) The report contained no untrue statement of material fact or omits to state a material fact necessary in order to make other statements made not misleading;

        (III)   Financial statements and information contained in such reports fairly presented in all material respects

the financial condition and results of operations of the reporting

company;

(IV) They were responsible for establishing and

maintaining internal controls;

(V)  They had disclosed to the reporting

company's independent auditors and audit committee of the board of

directors that all significant deficiencies in the design and

operation of internal controls that could adversely affect the

company's ability to record, process, summarize, and report financial

data and had identified to the independent auditors any material

weaknesses in internal controls; and

(VI) They had disclosed any fraud, whether or not

material, that involved management or other employees who have a

significant role.

ii.  Defendants WIEDERHORN and HERSHINGER, in their

capacity as CEO and CFO of defendant FAT, respectively, were required

to make these certifications in defendant FAT's periodic reports with

the SEC.

G.    DEFENDANT WIEDERHORN'S TAX DEBTS, IRS COLLECTION EFFORTS,
      MISREPRESENTATIONS AND MATERIAL OMISSIONS

35.  From at least 2006 to 2021, defendant WIEDERHORN was the

subject of ongoing IRS collection activities related to nonpayment of

personal income tax and Trust Fund Taxes owed by defendant WIEDERHORN

personally and as a responsible party and guarantor for entities,

including FOG.

36.  Beginning no later than April 2006, the IRS had issued to

defendant WIEDERHORN notices of intent to levy and notices of liens

and had also placed levies and liens on defendant WIEDERHORN's accounts and assets due to outstanding taxes he owed to the IRS.

37. Additional notices of intent to levy, notices of lien, and levies and liens were placed on his assets in ensuing years, including in 2009, 2010, 2011, 2013, 2014, 2016, and 2017.

38. In or around October 2015, an IRS Revenue Officer ("RO") interviewed defendant WIEDERHORN regarding unpaid Trust Fund Taxes, informed defendant WIEDERHORN of his personal liabilities for failure to pay Trust Fund Tax balances due and owing, and emphasized that the IRS could levy defendant WIEDERHORN's personal bank accounts along with defendant WIEDERHORN's other properties and assets should defendant WIEDERHORN remain delinquent on his federal tax obligations.

39. In or around April 2016, the IRS assessed defendant WIEDERHORN a penalty of $2,167,187 for FOG's failure to pay over Trust Fund Taxes from 2013 to 2015 and established an installment agreement for payment of the amounts he owed.

40. In or around September 2016, the IRS assessed defendant WIEDERHORN an additional penalty of $239,141 for failure to pay over Trust Fund Taxes owed by FOG from the first quarter of 2016.

41. In or around May 2018, the IRS assessed defendant WIEDERHORN an additional penalty of approximately $687,395 for FOG's failure to pay over Trust Fund Taxes from the second quarter of 2016 through the third quarter of 2017.

42. By on or about March 24, 2021, defendant WIEDERHORN's unpaid personal income tax liability to the IRS totaled approximately $7,743,952, inclusive of statutory interest and penalties, and his unpaid principal balance totaled approximately $3,664,224.

H.    RELEVANT CORPORATE STRUCTURE AND HISTORY OF DEFENDANT FAT AND

FOG

43.   In or around 2003, FOG purchased the Fatburger casual

burger franchise concept.

44.   In or around December 2011, FOG purchased Buffalo's Café,

another restaurant concept, and in or around 2017, FOG also purchased

two additional brands, Ponderosa and Bonanza steakhouses.

45.   In or around October 2017, defendant FAT completed an IPO

of some twenty percent (20%) of its equity being offered to and

purchased by the investing public.  In doing so, defendant FAT became

subject to the requirements of issuers under federal securities laws.

46.   After the IPO, FOG retained approximately eighty percent

(80%) of defendant FAT's common stock, and defendant FAT, in turn,

owned restaurant properties and brands including Fatburger North

America, Buffalo's Franchise Concepts, Ponderosa Franchising Company,

and Bonanza Restaurant Company.

47.   FOG's retention of 80% ownership of defendant FAT after the

IPO meant that any NOLs generated by FOG could also be used by

defendant FAT to lower its taxable income in the event of a merger

between those two entities.

48.   On or about September 6, 2017, in connection with its IPO,

defendant FAT disclosed that its "board of directors recognizes the

fact that transactions with related persons present a heightened risk

of conflicts of interests and/or improper valuation" and committed to

"adopt a written policy on transactions with related persons that is

in conformity with the requirements for issuers having publicly-held

common stock that is listed on NASDAQ."  Defendant FAT also disclosed

that its "new policy" would require, among other things, that:

14

a.   "any related person transaction . . . must be reviewed and approved or ratified by a committee of the board of directors composed solely of independent directors who are disinterested or by the disinterested members of the board of directors;

b.   any employment relationship or transaction involving an executive officer and any related compensation must be approved by the compensation committee of the board of directors or recommended by the compensation committee to the board of directors for its approval;

c.   In connection with the review and approval or ratification of a related person transaction:

i.   management must disclose to the committee or disinterested directors . . . the name of the related person . . . the material terms of the related person transaction, including the approximate dollar value of the amount involved in the transaction, and all the material facts as to the related person's direct or indirect interest in, or relationship to, the related person transaction;

ii.   management must advise the committee or disinterested directors, as applicable, as to whether the related person transaction complies with the terms of our agreements governing our material outstanding indebtedness that limit or restrict our ability to enter into a related person transaction;

iii. management must advise the committee or disinterested directors, as applicable, as to whether the related person transaction will be required to be disclosed in our applicable filings under the Securities Act or the Exchange Act, and related rules, and, to the extent required to be disclosed, management must

ensure that the related person transaction is disclosed in accordance
with such Acts and related rules; and

             iv.  management must advise the committee or
disinterested directors, as applicable, as to whether the related
person transaction constitutes a 'personal loan' for purposes of
Section 402 of the Sarbanes-Oxley Act."

49.  On or around July 3, 2018, defendant FAT entered into and
disclosed a Loan and Security Agreement with FB Lending, LLC, by
which FB Lending, LLC would lend $16 million to defendant FAT so that
defendant FAT could "retire and extinguish all of the existing senior
secured indebtedness" owed to another lender; "complete the
acquisition of Hurricane AMT, LLC"; "fund Transaction Costs"; and
"fund . . . general corporate purposes."

50.  On or around February 4, 2019, defendant FAT refinanced the
FB Lending Loan Services Agreement by entering into a new Loan and
Security Agreement (the "Lion Fund LSA") with The Lion Fund, L.P. and
The Lion Fund II, L.P. (collectively the "Lion Funds").  In this
refinancing, defendant FAT took on $20 million of debt at twenty
percent annual interest and used the proceeds to repay the existing
$16 million FB Lending loan plus accrued interest and fees and
provide what it described as additional general working capital to
defendant FAT.

51.  On or around December 11, 2020, defendant FAT announced
that it had entered into a merger agreement with FOG by which the
entities would be combined.  In connection with such merger,
defendant WIEDERHORN announced that the combination of defendant FAT
and FOG would, among other things, "eliminate limitations that
restrict our ability to use common stock for accretive acquisitions

and capital raising.  [FOG] holds more than $100 million of . . . NOL's, which could only be made available to [defendant FAT] as long as [FOG] owned at least 80% of [defendant FAT].  With this combination, the NOL's will be internalized at [defendant FAT], and we will now have much greater flexibility and optionality in our capital structure."

I.   DEFENDANT WIEDERHORN CAUSED DEFENDANT FAT AND FOG TO EXTEND, MAINTAIN, AND FORGIVE APPROXIMATELY $47 MILLION IN COMPENSATION TO HIM IN THE FORM OF SHAM SHAREHOLDER LOANS, WHICH HE AND DEFENDANT AMON KNEW WERE "DISGUISED COMPENSATION"

52.  From no later than in or around 2010 through in or around January 2021, defendant WIEDERHORN caused employees of defendant FAT and FOG to compensate him through approximately $47 million in distributions, which he concealed by categorizing them as "shareholder loans" for tax purposes.

53.  As of in or around December 2011, the "ending balance" on the distributions defendant WIEDERHORN had taken from FOG in the form of "loans" totaled approximately $2,063,045, and that balance grew annually as defendant WIEDERHORN continued to take distributions from defendant FAT and FOG.

54.  At no time did defendant WIEDERHORN make an interest payment upon any of the distributions he took in the asserted form of "shareholder loans," nor were interest payments demanded by FOG or defendant FAT.

55.  Although defendant WIEDERHORN had taken more than $20 million in distributions styled as "shareholder loans" from in or around January 2011 through January 2018, a former FOG CFO stated in an email of January 24, 2018, that FOG's loan documents from 2011 had

gone unexecuted.  The 2011 shareholder loan documents also set a limit for loans to defendant WIEDERHORN of $4 million.  At no time did the authorized FOG shareholder lending limit exceed $4 million.

56.  After defendant FAT became an issuer of securities through its IPO, defendant WIEDERHORN caused millions of dollars from defendant FAT's accounts to be disbursed to defendant WIEDERHORN and his family members for their personal benefit.  These disbursements were used to fund the purchase of private-jet travel, vacations, a Rolls Royce Phantom, other luxury automobiles, jewelry, and a piano.  Defendant WIEDERHORN caused employees of defendant FAT to account for the disbursements directly from defendant FAT to his accounts as: (i) an increase in an intercompany loan between defendant FAT and FOG; and (ii) an increase in FOG's shareholder loan "balance" or "receivable" to defendant WIEDERHORN.

57.  This accounting did not accurately describe the economic substance of these disbursements from defendant FAT to defendant WIEDERHORN.  After the IPO, FOG became a holding company with little to no business operations or associated revenues of its own.  FOG received the vast majority of its funds from defendant FAT.  Between the IPO and merger between defendant FAT and FOG, almost all of the "shareholder loan" from FOG to defendant WIEDERHORN derived from defendant FAT's revenues and borrowings.

58.  For example, on or about July 3, 2018, FB Lending LLC wired approximately $13,630,951 to defendant FAT pursuant to the parties' lending agreement.  Between on or around July 3, 2018, and on or around October 5, 2018, defendant FAT transferred approximately $5,207,351 of that amount to three accounts: a FOG Mechanics Bank account x3472, a Fatburger North America Mechanics Bank account

x3478, and a FOG Mechanics Bank account x3469.  Defendant WIEDERHORN directed an employee of defendant FAT to use approximately $944,185 of those funds to pay a balance owed on defendant WIEDERHORN's American Express ("AMEX") Centurion Card that paid for his personal expenses; approximately $105,000 to pay defendant WIEDERHORN's rent; and approximately $762,455 to be wired directly into defendant WIEDERHORN's personal Mechanics Bank account x3481.

59.  In another example, on or about January 30, 2019, the Lion Funds wired approximately $1,670,376 to a defendant FAT Mechanics Bank account x1080.  That same day, upon receipt of the Lion Funds wire, defendant WIEDERHORN caused approximately $623,364 to be transferred to the Fatburger North America Mechanics Bank account x3478, from which a $604,011 payment was made to satisfy defendant WIEDERHORN's AMEX Centurion Card personal debt.

60.  Between approximately on or about October 20, 2017, and May 13, 2019, defendant WIEDERHORN caused defendant FAT to pay more than $5 million from the Fatburger North America Mechanics Bank Account to satisfy defendant WIEDERHORN's personal debts owed on his AMEX Centurion Card.

61.  Although defendant FAT and FOG accounted for these disbursements as "loans," defendant WIEDERHORN characterized them as "distributions" and "compensation in excess of my salary" to defendant AMON, putative personal lenders, and others.

62.  For example, when seeking to establish creditworthiness with outside parties, on or about September 28, 2020, defendant WIEDERHORN wrote in an email that, in addition to his disclosed annual salary of approximately $400,000, he also received "$3m-4m of

distributions from my company as loans, then periodically the company forgives those loans."

63.    When describing FOG's capital structure to outside lenders, defendant WIEDERHORN also wrote, in or around April 25, 2017, that "[d]istributions to me (booked as compensation for tax purposes by the company) were made from time to time in the form of a loan/advance."

64.    As of on or about June 30, 2017, defendant WIEDERHORN had accrued a balance of approximately $22,438,798 (inclusive of unpaid "interest") in distributions booked in the form of a shareholder loan balance he owed to FOG.

65.    As of on or about December 31, 2017, defendant WIEDERHORN had transferred to himself additional amounts from defendant FAT and FOG totaling approximately $2,525,937 such that the total "balance" of distributions styled as "shareholder loans" (inclusive of unpaid "interest") was approximately $24,964,735.

66.    On or around January 17, 2018, defendant WIEDERHORN emailed defendant AMON a "personal financial statement" purporting to establish his insolvency and, therefore, his inability to repay existing "shareholder loan" debts owed to FOG.  On or around January 24, 2018, defendant AMON responded, noting that "the approach is complicated" due to the need to "[e]stablish that the advances are in fact true loans—meaning an advance with an expectation of repayment . . . v in your case disguised compensation."

67.    Working further on the preparation of defendant WIEDERHORN's 2017 income-tax filings on or around October 14, 2018, and preparing to categorize the entire balance owed by defendant WIEDERHORN to FOG as a set of two forgiven shareholder

loans, defendant AMON emailed defendant WIEDERHORN, "I am really struggling with the December 31, 2017 write off of about $2.464 million plus interest," because asserting that FOG had written off that second balance of approximately $2.5 million "puts in some risk the much larger June 2017 write off. That is, from a commercial perspective, why would a company advance additional monies if we just had to write off over $20 million in June of the same year?" "My concern is that the IRS will take issue with both write offs." Accordingly, defendant AMON suggested that he and defendant WIEDERHORN should "treat the advances . . . post June 2017 as compensation."

68. In response, defendant WIEDERHORN replied, "treat the $2.4 as a loan, then recognize as comp in 2018. The board was adamant that the old loans be written off in June. But when we found a new underwriter in Q3 and then completed the IPO in Q4, the board felt comfortable with the additional advances."

69. In fact, however, the FOG Board of Directors was not "adamant that the old loans be written off in June"; they were instead unaware of the quantity and timing of defendant WIEDERHORN's distributions because defendant WIEDERHORN unilaterally determined and controlled, without input or approval from the FOG Board of Directors, the nature, quantity, and timing of both his distributions made in the form of shareholder loans as well as all putative events of forgiveness of the distributions to himself made in the form of "shareholder loans."

70. Notwithstanding the agreement between defendants WIEDERHORN and AMON that "the $2.4" million would be recognized as taxable

income in defendant WIEDERHORN's 2018 income taxes, such amount was, in fact, never disclosed as taxable income in tax year 2018.

71.    After unilaterally causing FOG to "forgive" the $24 million in "shareholder debt" he owed to FOG as of the end of 2017, defendant WIEDERHORN continued to withdraw funds from defendant FAT and FOG until his "balance" reached approximately $16.8 million on or around December 31, 2019.

72.    On or about January 10, 2020, defendants WIEDERHORN and AMON agreed to treat this additional $16.8 million in total distributions to defendant WIEDERHORN as shareholder debts owed by defendant WIEDERHORN to FOG forgiven "as of" December 31, 2019, with defendant AMON emphasizing, "Insolvency . . . is . . . determined immediately before the debt discharge."

73.    When the emergence of the COVID-19 pandemic in March 2020 created a more convincing opportunity for defendant WIEDERHORN to justify "forgiving" the millions he had taken in the form of shareholder loans, however, defendant WIEDERHORN recharacterized the date upon which FOG (by defendant WIEDERHORN) had forgiven his $16.8 million in "debt" to coincide with the pandemic.  Thus, by in or around September 2020, defendant WIEDERHORN had characterized to defendant FAT's Board and independent auditors at Baker Tilly that the debt had been "forgiven" in or around March 2020.

74.    In or around March 2021, defendant AMON supervised the drafting of an Uncertain Tax Position ("UTP") Memo on behalf of defendant FAT to its independent auditors at Baker Tilly.

75.    One draft of the UTP Memo sent to defendant AMON by a subordinate, V.M., on or about March 11, 2021, contained the

assertion, "while the creditor [FOG] is still working with the debtor [defendant WIEDERHORN], it has ceased making loans to the debtor."

76.  On the following day, however, on or around March 12, 2021, V.M. notified defendant AMON that "only 19 million was written off at 3/1/2020, then the line got back up to $10 million around the date of the merger in December, and then they wrote off that $10.  So, I deleted the point that the creditor ceased making more loans to the debtor in March."

77.  Notwithstanding this material clarification and change to the circumstances of the distributions defendant WIEDERHORN had caused FOG to extend and forgive in the form of shareholder loans, neither defendant AMON, as drafter, nor defendant HERSHINGER, as named author, altered the conclusions of the UTP Memo that these distributions represented "a bona fide debt," nor did defendants AMON or HERSHINGER disclose in the UTP Memo that defendant WIEDERHORN had taken an additional $10 million in distributions after causing FOG to forgive $19 million in previous distributions in the form of a shareholder loan.

78.  In the UTP Memo, defendants AMON and HERSHINGER also included the following material misrepresentation: "In March of 2020 the Company assessed the collectability of the note. During the COVID-19 pandemic, the Company business operations [sic] suffered . . . . . Due to this, the likelihood of repayment seemed remote.  The Company deemed the note uncollectable and wrote-off the shareholder loan for $29 million as worthless.  Pursuant to Section 166 of the IRC, a deduction is allowed in the taxable year wherein deemed worthless.  As such, this resulted in COD [cancellation of debt] income to Andy Wiederhorn in the same year.  It is the Company's

understanding that Andy Wiederhorn will be recognizing income for the same amount on his personal tax returns."  As defendants AMON and WIEDERHORN knew, however, from communications between them, defendant WIEDERHORN had in fact determined to forgive $16.8 million of such distributions in the form of shareholder debt as of December 31, 2019, before the COVID-19 pandemic had created a new justification for doing so.

79.  Defendant WIEDERHORN recognized no taxable "cancellation-of-debt" income on his 2020 tax returns, which returns were prepared by and in consultation with defendant AMON.

80.  In addition to failing to disclose more recent forgiveness events of distributions in the form of a shareholder loan, the UTP Memo also failed to disclose to defendant FAT's independent auditor that the loans discussed in that memorandum followed prior distributions and related "events of forgiveness" in favor of defendant WIEDERHORN totaling tens of millions of dollars, including in the years 2016 through 2019.

J.   MATERIAL MISREPRESENTATIONS, OMISSIONS, AND CIRCUMVENTIONS OF INTERNAL CONTROLS BY DEFENDANTS WIEDERHORN AND HERSHINGER

81.  As the size of the intercompany transfers between defendant FAT and FOG increased to fund defendant WIEDERHORN's distributions in the form of a "shareholder loan" from FOG, both defendant FAT's Board and independent auditors raised concerns about the transfers to defendants WIEDERHORN and HERSHINGER.

82.  In response, defendants WIEDERHORN and HERSHINGER made material misrepresentations, omitted material facts, and caused others to make material misrepresentations, material omissions, and

1  misleading statements to defendant FAT's Board and independent

2  auditors regarding such intercompany transfers.

3        83.   For example:

4              a.   On or around March 22, 2019, a Hutchinson & Bloodgood

5  LLP, auditor asked defendant FAT's controller for information about

6  defendant FAT's January 30, 2019, payment of a $604,011.12 balance on

7  defendant WIEDERHORN's personal AMEX card.  A few days later, on or

8  around March 25, 2019, FAT's controller emailed defendant HERSHINGER

9  asking whether to send a proposed draft response informing the

10  auditor that "there are various Fatburger North America/FAT Brand

11  charges from Andy's Black AMEX card that are expensed to Fatburger

12  North America and FAT Brands."  After communicating with defendant

13  HERSHINGER, FAT's controller omitted in her response to the auditor

14  that many of the payments on that credit card, which balance

15  defendant FAT paid down, were defendant WIEDERHORN's personal

16  expenses.

17              b.   On or about May 11, 2019, a member of defendant FAT's

18  Board emailed defendant WIEDERHORN, defendant HERSHINGER, and

19  defendant FAT's then-auditors at Hutchison & Bloodgood asking about

20  the company's draft first quarter 2019 SEC Form 10-Q filing

21  reflecting "activity in [the] inter company account," which indicated

22  an increase in the transfer of funds from defendant FAT to FOG.  On

23  or about that same day, defendant WIEDERHORN responded to defendant

24  FAT's Board only, prefacing, "I've removed the Auditors from this e-

25  mail string as this is a board communication, not auditor

26  communication," before misrepresenting to defendant FAT's Board that

27  "[t]he increase in intercompany is a combination of tax benefit from

28  the loss . . ., interest on the intercompany debt $416k, and

25

principal invested 'in guarantor'/loaned in lieu of the cash

dividends for [FOG] to pay the various tax and legal settlements and

other obligations pending the refi and merger (structured this way to

comply with the original FB lending loan)." In this communication,

defendant WIEDERHORN failed to disclose and materially omitted that

the intercompany balance had increased because of defendant

WIEDERHORN's continuing transfers from defendant FAT to FOG, which he

documented in the form of FOG's "shareholder loan" to himself. These

transfers included payment of the $604,011.12 balance in or around

January 2019 on defendant WIEDERHORN's personal AMEX credit card.

84. In or around February and March 2020, certified public

accountants employed by defendant FAT's new independent auditor,

Squar Milner LLP, began focusing on the increase in intercompany

transfers between defendant FAT and FOG, the reasons for the

transfers, and the process by which defendant FAT had authorized

those transfers.

85. On or about February 25, 2020, defendant HERSHINGER sent

defendant WIEDERHORN a spreadsheet from Squar Milner, which requested

additional information about defendant FAT's 2019 journal entries

related to the intercompany transfers between defendant FAT and FOG.

Included in the spreadsheet was the January 30, 2019 payment from

defendant FAT of the $604,011.12 balance on defendant WIEDERHORN's

personal AMEX credit card.

86. On or about March 2, 2020, defendant WIEDERHORN sent

defendant HERSHINGER an email attaching a spreadsheet with defendant

WIEDERHORN's explanations for the transactions identified by Squar

Milner. In his responses, defendant WIEDERHORN misrepresented and

misleadingly described the transfers that were made for his own

personal benefit by not disclosing his personal interest in those transactions. For example, defendant WIEDERHORN described defendant FAT's January 30, 2019, payment of his $604,011.12 personal credit card bill as "Payment on Amex account for corporate and intercompany (see Amex bill)," without disclosing that this transaction was for his undisclosed personal benefit. On or around March 3, 2020, defendant HERSHINGER forwarded defendant WIEDERHORN's message to Squar Milner.

87. On or around March 6, 2020, and referring to a "conversation from the other day" between Squar Milner's Los Angeles Managing Partner ("Managing Partner") and defendant WIEDERHORN, Managing Partner sent defendant WIEDERHORN an email requesting "clarity in the related party disclosures" in connection with defendant FAT's 2019 SEC Form 10-K because "[r]elated party disclosures are a hot button focus issue for the SEC." To that end, the email noted Squar Milner would be sending defendant WIEDERHORN a related-party questionnaire to fill out because "much of our reliance on these transactions is based on the representations of management." In the same email, Managing Partner also told defendant WIEDERHORN that the loans from defendant FAT to FOG "are allowable if they are to [FOG] and not to you personally."

88. Managing Partner forwarded that email along with other messages in a related chain to defendant HERSHINGER on or around March 19, 2020; neither defendant HERSHINGER nor defendant WIEDERHORN disclosed to Managing Partner or anyone else at Squar Milner at that time or for months thereafter that, in fact, "the loans" were to defendant WIEDERHORN "personally." Instead, they omitted this material fact.

89.  On or about March 23, 2020, defendant WIEDERHORN completed and executed the related-party questionnaire and materially misrepresented the nature of the intercompany advances from defendant FAT to FOG.  Though defendant WIEDERHORN identified the intercompany loan between defendant FAT and FOG as a related-party transaction, he misrepresented that "$0" of those transactions were for defendant WIEDERHORN's personal benefit in 2019 and 2018.  In reality, as defendant WIEDERHORN knew, millions of dollars of funds transferred from defendant FAT to FOG pursuant to the intercompany account were for defendant WIEDERHORN's personal benefit in 2018 and 2019.  In executing this questionnaire, defendant WIEDERHORN also certified that his answers were "correctly stated to the best of my knowledge and belief."

90.  On or about April 27, 2020, defendants WIEDERHORN and HERSHINGER, in their capacities as defendant FAT's CEO and CFO, signed and sent a representation letter to Squar Milner in connection of their audit of defendant FAT.  In the letter, defendants WIEDERHORN and HERSHINGER certified that, among other representations, "we have disclosed to you the identity of the entity's related parties and all information concerning related-party relationships, transactions and amounts receivable from or payable to related parties of which we are aware, including support for any assertion that a transaction with a related party was conducted on terms equivalent to those prevailing in an arm's-length transaction."

91.  During this same time, Squar Milner also expressed concern to defendants WIEDERHORN and HERSHINGER regarding the authorization process for the transfer of funds from defendant FAT to FOG.  On or about April 20, 2020, Squar Milner sent defendant HERSHINGER an email

identifying a potential "material weakness" in defendant FAT's internal controls for related party transactions in 2019.  Squar Milner emphasized that "the CEO has the ability to transfer funds for parent company advances, at no limit, without Board approval and there was no formal agreement for the advances."  On or around April 24, 2020, Squar Milner submitted a report to defendant FAT's audit committee identifying the same control deficiencies for transfers from defendant FAT to FOG.

92.  To address this identified deficiency in authorization procedures for intercompany transfers, defendants WIEDERHORN and HERSHINGER created (and defendant WIEDERHORN signed) the Intercompany Revolving Credit Agreement ("IRCA") on or about April 14, 2020.  The IRCA provided that, beginning in the second quarter 2020, any additional loans from defendant FAT to FOG "shall be subject to the approval of [defendant FAT]'s board of directors, in advance on a quarterly basis."  Defendant FAT's Board approved the IRCA during a meeting on or around April 14, 2020.

93.  As reflected by minutes taken by defendant HERSHINGER of the April 14, 2020 Special Meeting of defendant FAT's Board, the Board "engaged in a rigorous discussion about the Intercompany Agreement."  Nevertheless, neither defendant WIEDERHORN nor defendant HERSHINGER disclosed to defendant FAT's Board the material fact that a majority of the funds to be loaned by defendant FAT to FOG pursuant to the IRCA would then be distributed to defendant WIEDERHORN in the form of shareholder loans.  Instead, defendants WIEDERHORN and HERSHINGER omitted this material fact from defendant FAT's Board. Defendant FAT's Board did not approve any advances from defendant FAT to FOG during the April 24, 2020 Special Meeting.

94.  On or around April 21, 2020, defendant FAT's Board approved a $50,000 increase in the intercompany loan to FOG and resolved that any further disbursements would require and be addressed at subsequent meetings.

95.  On or around April 28, 2020, defendant WIEDERHORN emailed defendant FAT's Board members about his request for additional loans from defendant FAT to FOG.  In that message, defendant WIEDERHORN asserted, "I have navigated the cashflow of both FAT and FOG through these difficult three years carefully keeping in mind the best interests of all FAT shareholders as well as FOG shareholders.  It does no good to create a situation where FOG is put at risk with its existing creditors, hence putting the NOL at risk."  Defendant WIEDERHORN additionally falsely stated that "[f]unds at FOG are used to pay pre-existing pre-IPO liabilities" and listed a number of specific liabilities with associated monthly payment requirements. At the end of the FOG liabilities list, defendant WIEDERHORN also noted that funds loaned under the IRCA would also be devoted to "SG&A, including compensation at [FOG]."  Defendant WIEDERHORN provided no quantitative estimate or information for this line item, however, nor did defendant WIEDERHORN disclose that he would route a majority of the funds requested to himself in the form of a shareholder loan.

96.  On or around April 28, 2020, defendant FAT's Board approved a $1 million increase in the intercompany loan to FOG for the second quarter of 2020.

97.  Also on or about April 28, 2020, defendant FAT filed its 2019 SEC Form 10-K with the SEC.  In it, defendants WIEDERHORN and HERSHINGER certified that they had "reviewed" the annual report and

that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendants WIEDERHORN and HERSHINGER also certified, among other things, that the financial statements within that report fairly presented "in all material respects the financial condition, results of operations, and cash flows" of the company and that they had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." Nevertheless, neither defendant WIEDERHORN nor defendant HERSHINGER disclosed any of the transfers from defendant FAT to defendant WIEDERHORN personally as related-party transactions in the 2019 SEC Form 10-K.  Nor did defendants WIEDERHORN and HERSHINGER disclose any of these transfers as executive compensation to defendant WIEDERHORN in the 2019 SEC Form 10-K.

98.  On or around July 13, 2020, defendant FAT's Board approved another $1 million increase in the loan to FOG for the third quarter of 2020.

99.  In connection with these additional disbursements from defendant FAT to FOG, neither defendant WIEDERHORN nor defendant HERSHINGER disclosed to defendant FAT's Board that the majority of such disbursements would be distributed to defendant WIEDERHORN in the form of a shareholder loan from FOG for his own undisclosed personal enrichment.

100. Without obtaining the necessary Board approvals, defendant WIEDERHORN also caused distributions from defendant FAT to FOG that

exceeded the amounts authorized by the IRCA and defendant FAT's Board in both the second and third quarters of 2020.

101. In the second quarter 2020, defendants WIEDERHORN and HERSHINGER advanced approximately $1,354,531 in loans to FOG -- approximately $304,531 over the limit.  In the third quarter 2020, defendant FAT's intercompany loan ledger showed that defendants WIEDERHORN and HERSHINGER advanced approximately $3,762,680 in loans to FOG -- approximately $2,762,679 over the limit.

102. In the fourth quarter of 2020, defendants WIEDERHORN and HERSHINGER advanced an additional $3,133,891 to FOG, much of which FOG disbursed to defendant WIEDERHORN personally.

COUNT ONE

[26 U.S.C. § 7212(a)]

[DEFENDANT WIEDERHORN]

103. The Grand Jury realleges paragraphs 1 through 102 of this Indictment here.

104. Beginning no later than in or around 2010, and continuing until at least in or about October 22, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant WIEDERHORN, knowing of ongoing IRS collection activities, corruptly obstructed and impeded, and corruptly endeavored to obstruct and impede, the due administration of the internal revenue laws of the United States.

105. The corrupt obstruction, impedance, and corrupt endeavors to obstruct and impede operated, in substance, as alleged above in this Indictment and including the following manners and by the following means, each such act having a nexus to obstructing the IRS's collection actions:

    a.    After the IRS had issued notices to defendant WIEDERHORN no later than 2006 of its intent to levy defendant WIEDERHORN's bank accounts and place liens upon his assets for unpaid balances owed, defendant WIEDERHORN, on or about March 14, 2011, placed a lease to purchase his Los Angeles residence not in his own name, but in the name of a predecessor and affiliate of FAT.

    b.    From no later than in or around 2010 through in or around January 2021, defendant WIEDERHORN caused FAT and FOG to compensate him through approximately $47,000,000 in distributions, which, although made and forgiven in the form of "shareholder loans," were, in fact, as defendant WIEDERHORN knew, his taxable income.

1          c.    Defendant WIEDERHORN caused these distributions to be
2    made to him by FAT and FOG notwithstanding that:

3               i.    Defendant WIEDERHORN had no intent to repay these
4    distributions at the times he caused FAT and FOG to make them.

5               ii.   Neither FAT nor FOG undertook an underwriting
6    process to determine defendant WIEDERHORN's suitability as a
7    borrower, including from in or around 2017 through January 2021,
8    after defendant WIEDERHORN had caused millions of dollars of prior
9    distributions given in the form of shareholder loans to be
10   "forgiven."

11              iii. Neither FAT nor FOG collected interest payments
12   from defendant WIEDERHORN on these distributions given in the form of
13   shareholder loans.

14              iv.   Neither FAT nor FOG required defendant WIEDERHORN
15   to pledge or provide any collateral in connection with these
16   distributions given in the form of shareholder loans.

17              v.    Neither FAT nor FOG required defendant WIEDERHORN
18   to adhere to a repayment schedule for these distributions given in
19   the form of shareholder loans.

20              vi.   Defendant WIEDERHORN, and not the Boards of
21   Directors of FAT or FOG, made the ultimate decisions as to whether
22   and when to cancel and forgive such distributions given in the form
23   of shareholder loans.

24         d.    Beginning no later than in or around 2016 and
25   continuing through at least in or around January 2021, defendant
26   WIEDERHORN caused FAT to make direct payments upon defendant
27   WIEDERHORN's personal credit-card and other debts, including for

28

private aviation services, in order to conceal these expenditures from the IRS.

e.   Beginning no later than in or around March 2011 and continuing through at least in or around May 2021, defendant WIEDERHORN attempted to frustrate, evade, and delay payment of a substantial part of approximately $7,314,020 in federal taxes due to and owed by him by submitting materially false IRS Forms 433-A to the IRS, lying to assigned IRS Revenue Officers, using nominee individuals and business entities to hide assets, and engaging in a long-term scheme to conceal additional unreported income.  Among other material misrepresentations and acts defendant WIEDERHORN made and undertook and caused to be made and undertaken to frustrate, evade, and delay payment:

i.   On or about March 23, 2016, defendant WIEDERHORN, through an authorized representative, submitted a Form 433-A to the IRS containing material misstatements and omitting material information, including his access to and use of an AMEX Centurion credit card, the magnitude and nature of his "Actual Monthly Expenses," "Total Living Expenses," and "Total Income."

ii.   On or about November 30, 2017, defendant WIEDERHORN, through an authorized representative, sent a letter to the IRS attaching a check for $10,000.  By his letter, defendant WIEDERHORN represented that, apart from "restricted Fat Brands stock with a time-lock," he had "no cashflow for . . . the next twelve months other than his salary," and requested "that the levies on [his] bank accounts [be] released and his installment agreement be reinstated with this new information."

iii. On or about June 12, 2018, defendant WIEDERHORN submitted to an IRS RO an executed Form 433-A of the same date containing materially false information and materially false omissions, including:

(I)    An assertion that defendant WIEDERHORN's Oregon residence was in "foreclosure," when, in fact, defendant WIEDERHORN had requested and received a mortgage modification in March 2018 and had listed the same residence as an asset with a net value of $5,750,000 on an application for a mortgage for a different residential property.

(II) Misstating the list of credit card accounts required to be reported by omitting defendant WIEDERHORN's personal AMEX Centurion credit card from the list of all credit card accounts.

(III)    Misstating the list of assets required to be reported by omitting an option to purchase his Los Angeles residence, for which residence defendant WIEDERHORN had emailed a financial statement to a mortgage broker the very same day and which listed that Los Angeles residence as an $8 million net asset.

(IV) Misstating the list of miscellaneous property by disclosing only $10,000 in miscellaneous property when in fact defendant WIEDERHORN and his wife owned at least approximately hundreds of thousands of dollars of personal property.

(V)    Misstatements and omissions regarding the magnitude and nature of his "Actual Monthly Expenses," "Total Living Expenses," and "Total Income."

(VI) Misstating assets by omitting a 2016 Rolls Royce Phantom Drophead Coupe, which defendant WIEDERHORN had

purchased for $435,211.13 just three days prior, on or around June 9, 2018, and for which he had made a down payment of $150,000.

(VII)    Misstating assets by omitting a Mercedes Benz G63 AMG, which defendant WIEDERHORN had leased just ten days prior, on or around June 2, 2018.

iv.  On or around August 24, 2018, defendant WIEDERHORN caused an LLC he controlled, 929 Foothill, LLC, to offer to purchase his residence for approximately $9,094,137, and caused 929 Foothill, LLC, to in fact purchase that residence in or around September 20, 2018, for approximately $9,094,500.

1                          COUNT TWO

2                      [26 U.S.C. § 7201]

3                   [DEFENDANT WIEDERHORN]

4        106. The Grand Jury realleges paragraphs 1 through 102 and 105

5   of this Indictment here.

6        107. Beginning no later than in or around March 2011 and

7   continuing through at least in or around May 2021, in Los Angeles

8   County, within the Central District of California, and elsewhere,

9   defendant WIEDERHORN willfully and affirmatively attempted to evade

10  and defeat the payment of a substantial part of approximately

11  $7,314,020 in federal taxes and additions to taxes then due and owing

12  by defendant WIEDERHORN to the United States of America,

13  specifically, approximately $3,914,285 in TFRPs as well as

14  approximately $3,399,735 in penalties, which had been assessed

15  against defendant WIEDERHORN, by committing, among others, the

16  affirmative acts alleged in paragraph 105, the likely effect of each

17  of which would have been to mislead and conceal defendant

18  WIEDERHORN's assets and ability to pay defendant WIEDERHORN's

19  outstanding taxes from the IRS.

20

21

22

23

24

25

26

27

28

COUNT THREE

[26 U.S.C. § 7201]

[DEFENDANT WIEDERHORN]

108. The Grand Jury realleges paragraphs 1 through 102 and 105 of this Indictment here.

109. During the calendar year 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant WIEDERHORN received taxable income, upon which there was income tax due and owing to the United States of America.

110. Beginning in or around January 2016 and continuing through at least in or around February 6, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant WIEDERHORN willfully attempted to evade and defeat the assessment of the above-stated income tax due and owing by him to the United States for the calendar year 2016 by committing the acts alleged previously in this Indictment, and by committing the following affirmative acts:

a. Causing to be prepared, and signing, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, filed with the IRS for calendar year 2016 on behalf of himself and another, which declared only approximately $280,171 in taxable income, when, in fact, defendant WIEDERHORN had generated additional unreported income in the approximate amount of $2,834,601;

b. Causing FAT and its predecessors and affiliates to make direct distributions to him, including in the form of payment of his personal credit-card debts; and

c. Taking distributions from FOG in the form of shareholder loans.

COUNT FOUR

[26 U.S.C. § 7201]

[DEFENDANT WIEDERHORN]

111. The Grand Jury realleges paragraphs 1 through 102 and 105 of this Indictment here.

112. During the calendar year 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant WIEDERHORN received taxable income, upon which there was income tax due and owing to the United States of America.

113. Beginning in or around January 2017 and continuing through at least in or around October 30, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant WIEDERHORN willfully attempted to evade and defeat the assessment of the above-stated income tax due and owing by him to the United States for the calendar year 2017 by committing acts alleged previously in this Indictment, and by committing the following affirmative acts:

    a.    Causing to be prepared, and signing, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, filed with the IRS for calendar year 2017 on behalf of himself and another, which declared only approximately $360,807 in taxable income, when, in fact, defendant WIEDERHORN had generated additional unreported income in the approximate amount of $3,909,850;

    b.    Causing FAT and its predecessors and affiliates to make direct distributions to him, including in the form of payment of his personal credit-card debts; and

    c.    Taking distributions from FOG in the form of shareholder loans.

40

1

COUNT FIVE

2

[26 U.S.C. § 7201]

3

[DEFENDANT WIEDERHORN]

4    114. The Grand Jury realleges paragraphs 1 through 102 and 105

5    of this Indictment here.

6    115. During the calendar year 2018, in Los Angeles County,

7    within the Central District of California, and elsewhere, defendant

8    WIEDERHORN received taxable income, upon which there was income tax

9    due and owing to the United States of America.

10    116. Beginning in or around January 2018 and continuing through

11    at least in or around October 15, 2019, in Los Angeles County, within

12    the Central District of California, and elsewhere, defendant

13    WIEDERHORN willfully attempted to evade and defeat the assessment of

14    the above-stated income tax due and owing by him to the United States

15    for the calendar year 2018 by committing acts alleged previously in

16    this Indictment, and by committing the following affirmative acts:

17        a.   Causing to be prepared, and signing, a false and

18    fraudulent U.S. Individual Income Tax Return, Form 1040, filed with

19    the IRS for calendar year 2018 on behalf of himself, which declared

20    only approximately $354,356 in taxable income, when, in fact,

21    defendant WIEDERHORN had generated additional unreported income in

22    the approximate amount of $8,932,012;

23        b.   Causing FAT to make direct distributions to him,

24    including in the form of payment of his personal credit-card debts;

25    and

26        c.   Taking distributions from FOG in the form of

27    shareholder loans.

28

1

2

3

COUNT SIX

[26 U.S.C. § 7201]

[DEFENDANT WIEDERHORN]

4      117. The Grand Jury realleges paragraphs 1 through 102 and 105

5  of this Indictment here.

6      118. During the calendar year 2019, in Los Angeles County,

7  within the Central District of California, and elsewhere, defendant

8  WIEDERHORN received taxable income, upon which there was income tax

9  due and owing to the United States of America.

10      119. Beginning in or around January 2019 and continuing through

11  at least in or around November 23, 2020, in Los Angeles County,

12  within the Central District of California, and elsewhere, defendant

13  WIEDERHORN willfully attempted to evade and defeat the assessment of

14  the above-stated income tax due and owing by him to the United States

15  for the calendar year 2019 by committing acts alleged previously in

16  this Indictment, and by committing the following affirmative acts:

17          a.   Causing to be prepared, and signing, a false and

18  fraudulent U.S. Individual Income Tax Return, Form 1040, filed with

19  the IRS for calendar year 2019, which declared only approximately

20  $295,614 in taxable income, when, in fact, defendant WIEDERHORN had

21  generated additional unreported income in the approximate amount of

22  $7,025,311;

23          b.   Causing FAT to make direct distributions to him,

24  including in the form of payment of his personal credit-card debts;

25  and

26          c.   Taking distributions from FOG in the form of

27  shareholder loans.

28

42

COUNT SEVEN

[26 U.S.C. § 7201]

[DEFENDANT WIEDERHORN]

120. The Grand Jury realleges paragraphs 1 through 102 and 105 of this Indictment here.

121. During the calendar year 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant WIEDERHORN received taxable income, upon which there was income tax due and owing to the United States of America.

122. Beginning in or around January 2020 and continuing through at least in or around October 22, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant WIEDERHORN willfully attempted to evade and defeat the assessment of the above-stated income tax due and owing by him to the United States for the calendar year 2020 by committing acts alleged previously in this Indictment, and by committing the following affirmative acts:

a.   Causing to be prepared, and signing, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, filed with the IRS for calendar year 2020, which declared only approximately $305,131 in taxable income, when, in fact, defendant WIEDERHORN had generated additional unreported income in the approximate amount of $9,598,483;

b.   Causing FAT to make direct distributions to him, including in the form of payment of his personal credit-card debts; and

c.   Taking distributions from FOG in the form of shareholder loans.

43

COUNTS EIGHT THROUGH ELEVEN

[26 U.S.C. § 7206(2)]

[DEFENDANT AMON]

123. The Grand Jury realleges paragraphs 1 through 102 and 105 of this Indictment here.

124. On or about the dates listed below, in Los Angeles County, within the Central District of California, and elsewhere, defendant AMON willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the IRS, of U.S. Individual Income Tax Returns, IRS Form 1040s, on behalf of Andrew A. Wiederhorn for the calendar years indicated below, which returns were false and fraudulent as to a material matter in that they understated the wages and other compensation paid to Wiederhorn, thereby understating the income and other taxes due to the United States of America, as defendant AMON then knew:

| COUNT | DATE | CALENDAR YEAR |
|---|---|---|
| EIGHT | 10/30/2018 | 2017 |
| NINE | 10/15/2019 | 2018 |
| TEN | 11/23/2020 | 2019 |
| ELEVEN | 10/22/2021 | 2020 |

1          COUNTS TWELVE THROUGH FIFTEEN

2             [18 U.S.C. § 1343]

3          [DEFENDANTS WIEDERHORN AND HERSHINGER]

4     125. The Grand Jury realleges paragraphs 1 through 102 and 105

5 of this Indictment here.

6 A.   THE SCHEME TO DEFRAUD

7     126.  Beginning no later than in or around September 2018 and

8 continuing through at least in or around January 2021, in Los Angeles

9 County, within the Central District of California, and elsewhere,

10 defendants WIEDERHORN and HERSHINGER, knowingly and with intent to

11 defraud, devised, participated in, and executed a scheme to defraud

12 FAT's Board and minority shareholders as to material matters, and to

13 obtain money and property, namely, approximately $17,000,000 in

14 undisclosed and materially misrepresented distributions in the form

15 and forgiveness of shareholder loans, by means of materially false

16 and fraudulent pretenses, representations, and promises, and by the

17 concealment and omission of material facts.

18     127. The fraudulent scheme operated, in substance, as described

19 in paragraphs 42 through 102 of this Indictment and as follows:

20          a.   Defendant WIEDERHORN transferred and caused employees

21 of FAT and its affiliates and predecessors to transfer to him

22 millions of dollars of distributions and compensation in the form of

23 payments toward defendant WIEDERHORN's credit-card and other personal

24 debts and payments to defendant WIEDERHORN's family members.

25          b.   Knowing of these payments, and notwithstanding their

26 fiduciary duties to FAT, neither defendant WIEDERHORN nor defendant

27 HERSHINGER informed FAT's Board, its independent auditors, its

28 minority shareholders, the SEC, or the broader investing public that

defendant WIEDERHORN was receiving millions of dollars in undisclosed distributions and compensation from FAT, and instead materially misrepresented the nature of these transactions and the extent to which FAT had instituted appropriate controls concerning its financial operations and intercompany transactions.

c.    Exceeding loan authorizations by FOG's Board by millions of dollars, defendant WIEDERHORN also took millions of dollars of distributions and compensation in the form of shareholder loans from FOG, which "loans" he never intended to repay and never repaid.

d.    In order to fund FOG's distributions and compensation to him in the form of shareholder loans, defendant WIEDERHORN caused FAT to extend and maintain intercompany loans to FOG while misrepresenting the purpose and nature of such intercompany loans and omitting, along with defendant HERSHINGER, the material fact that such loans from FAT to FOG were primarily for the purpose of funding FOG's distributions and compensation in the form of shareholder loans to defendant WIEDERHORN.

//

//

B.    USE OF THE WIRES

128. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendants WIEDERHORN and HERSHINGER transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

| COUNT | DATE | INTERSTATE WIRE TRANSMISSION |
|---|---|---|
| TWELVE | 5/11/2019 | Email sent by defendant WIEDERHORN from the Central District of California to FAT's Board and others within, through, and outside of the Central District of California with the subject, "10Q & Earning Release" |
| THIRTEEN | 4/28/2020 | Email sent by defendant WIEDERHORN from the Central District of California to FAT's Board and others within, through, and outside of the Central District of California with the subject, "Supplement to Allen's memo re: Intercompany Loan" |
| FOURTEEN | 8/31/2020 | Wire transfer in the amount of $10,000 from FAT's Bank of America bank account x7899 within the Central District of California through the FedWire system to CalPrivate Bank account x7817 in the name of Andrew A. Wiederhorn within the Central District of California |
| FIFTEEN | 8/31/2020 | Wire transfer in the amount of $30,000 from FAT's Bank of America bank account x7899 within the Central District of California through the FedWire system to CalPrivate Bank account x7795 in the name of Andrew A. Wiederhorn within the Central District of California. |

1                          COUNTS SIXTEEN AND SEVENTEEN

2                  [15 U.S.C. §§ 78m(k)(1), 78ff; 18 U.S.C. § 2(b)]

3                    [DEFENDANTS WIEDERHORN, HERSHINGER, AND FAT]

4        129. The Grand Jury realleges paragraphs 1 through 102 and 105

5   of this Indictment here.

6        130. On or about the following dates, in Los Angeles County,

7   within the Central District of California, and elsewhere, defendant

8   FAT knowingly and willfully extended and maintained credit, arranged

9   for the extension of credit, and renewed an extension of credit, and

10  defendants WIEDERHORN and HERSHINGER willfully caused the extension

11  and maintenance of credit, arrangement for the extension of credit,

12  and renewal of an extension of credit, directly and indirectly, in

13  the form of the personal loans set forth below, to and for a director

14  and executive officer of defendant FAT, namely, defendant WIEDERHORN:

| COUNT | DATE(S) | AMOUNT | SOURCE |
|-------|---------|--------|--------|
| SIXTEEN | 1/30/2019 | $604,011.12 | Transfer from Fatburger N.A. Mechanics Bank Account x3478 within the Central District of California to defendant WIEDERHORN's personal AMEX Account Ending in 5007 in the form of a personal loan to defendant WIEDERHORN |
| SEVENTEEN | 4/1/2020 to 9/30/2020 | $2,050,000 | Loans from defendant FAT to FOG pursuant to the IRCA then indirectly extended in the form of a loan to defendant WIEDERHORN within the Central District of California. |

COUNTS EIGHTEEN THROUGH TWENTY

[15 U.S.C. §§ 78m(b)(2), 78ff; 17 C.F.R. § 240.13b2-2]

[DEFENDANTS WIEDERHORN AND HERSHINGER]

131. The Grand Jury realleges paragraphs 1 through 102 and 105 of this Indictment here.

132. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants WIEDERHORN and HERSHINGER, acting as officers of FAT, knowingly and willfully, directly and indirectly, made and caused to be made a material false and misleading statement, and omitted to state and caused another person to omit to state material facts necessary in order to make a statement made, in light of the circumstances under which the statement was made, not misleading, to accountants employed by FAT's auditor, Squar Milner, LLP, in connection with the audit, review, and examination of FAT's financial statements for fiscal year 2019 and the preparation and filing of FAT's 2019 SEC Form 10-K. Specifically, defendants WIEDERHORN and HERSHINGER made the materially false and misleading statements, and omissions of material facts in order to make statements made not misleading, set forth in the following documents regarding: (i) the fact that many transfers of funds from FAT to FOG purportedly pursuant to an intercompany loan between the two companies were, in fact, made directly from FAT to defendant WIEDERHORN for his personal benefit; and (ii) that the majority of the funds extended from FAT to FOG pursuant to the intercompany loan between the two companies in fact went to

//

//

defendant WIEDERHORN in the form of shareholder loans from FOG to defendant WIEDERHORN.

| COUNT | DEFENDANT(s) | DATE | DOCUMENT |
|-------|--------------|------|----------|
| EIGHTEEN | WIEDERHORN and HERSHINGER | 3/3/2020 | Email, Subject: "FW: Auditor Requests," from defendant HERSHINGER to Squar Milner, with attachment "Copy of Related Party Selections – AW Responses.xlsx," which forwarded a March 2, 2020 E-mail, Subject: "RE: Auditor Requests," from defendant WIEDERHORN to defendant HERSHINGER, with the same attachment, in connection with preparation of FAT's 2019 SEC Form 10-K, related to characterization and disposition of "intercompany advances" from FAT to FOG |
| NINETEEN | WIEDERHORN | 3/23/2020 | "Fat Brands, Inc. RELATED PARTY QUESTIONNAIRE," in connection with preparation of FAT's 2019 SEC Form 10-K, related to characterization and disposition of "intercompany advances" from FAT to FOG and the existence of internal controls over related-party transactions |

| COUNT | DEFENDANT(s) | DATE | DOCUMENT |
|-------|--------------|------|----------|
| TWENTY | WIEDERHORN and HERSHINGER | 4/27/2020 | Representation letter from FAT, signed by defendants WIEDERHORN and HERSHINGER, in connection with preparation of FAT's 2019 SEC Form 10-K, representing that "[w]e have disclosed to you the identity of the entity's related parties and all information concerning related-party relationships, transactions, and amounts receivable from or payable to related parties of which we are aware" |

COUNT TWENTY-ONE

[18 U.S.C. § 1350(c)(2); 17 C.F.R. §§ 229.402, 229.404]

[DEFENDANTS WIEDERHORN AND HERSHINGER]

133. The Grand Jury realleges paragraphs 1 through 102 and 105 of this Indictment here.

134. On or about April 27, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendants WIEDERHORN and HERSHINGER knowingly and willfully certified that a periodic report containing financial statements, namely, a 2019 SEC Form 10-K for FAT, fully complied with the requirements of section 13(a) of the Securities Exchange Act of 1934 and that the information contained in the periodic report fairly presented, in all material respects, the financial condition and results of operations of the issuer, knowing that the periodic report accompanying the statement did not comport with all the requirements of that section, namely, that the 2019 SEC Form 10-K omitted certain direct and indirect transfers of funds from FAT to defendant WIEDERHORN for his personal benefit in excess of $120,000 during 2019.

COUNT TWENTY-TWO

[18 U.S.C. § 1001(a)(2)]

[DEFENDANT HERSHINGER]

135. The Grand Jury realleges paragraphs 1 through 102 and 105 of this Indictment here.

136. On or around December 1, 2021, in Los Angeles County, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the Federal Bureau of Investigation ("FBI"), IRS Criminal Investigation ("IRS-CI"), and the United States Attorney's Office for the Central District of California, defendant HERSHINGER knowingly and willfully made materially false statements and representations to the FBI knowing that these statements and representations were untrue, namely:

a.    When asked by special agents of the FBI whether she was "at any point . . . aware of company funds being used to pay for [Andrew A. Wiederhorn's] personal [AMEX] credit card," defendant HERSHINGER answered, "No."  In fact, defendant HERSHINGER then knew that FAT's funds were routinely used to pay for Wiederhorn's personal AMEX credit card.

b.    When asked by special agents of the FBI, "at some point, did you become aware that [FOG] was loaning [Wiederhorn] money," defendant HERSHINGER responded, "I wasn't aware of that."  In fact, defendant HERSHINGER then knew that FOG had a large shareholder loan with Wiederhorn.

c.    When asked by special agents of the FBI, "is your understanding that . . . the purpose of the loans between [FAT and FOG] is for a business reason," defendant HERSHINGER responded that she "never had any understanding that this was for anything

53

1   personal."  In fact, defendant HERSHINGER then knew that at least
2   hundreds of thousands of dollars transferred by FAT to FOG were for
3   personal benefit of Wiederhorn.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c)]

137. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Twelve through Twenty of this Indictment.

138. Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

139. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/s/
Foreperson

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRETT A. SAGEL
Assistant United States Attorney
Chief, Corporate and Securities
Fraud Strike Force

ALEXANDER B. SCHWAB
Assistant United States Attorney
Deputy Chief, Corporate and
  Securities Fraud Strike Force

ADAM P. SCHLEIFER
Assistant United States Attorney
Corporate and Securities Fraud
  Strike Force

KEVIN B. REIDY
Assistant United States Attorney
Major Frauds Section